**Hand-Delivered**

# UNITED STATES DISTRICT COURT

for the

WESTERN District of NORTH CAROLINA

CHARLOTTE Division

FILED
CHARLOTTE, NC

JUN 11 2018

US District Court
Western District of NC

LISA ANTOINE (PRO-SE)
Plaintiff(s)
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

-v-

RYAN ELLIOTTE
C/O ELLIOTTE MANOR
Defendant(s)
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:18 CV 302 - FDW
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)* ☐ Yes ☒ No

## COMPLAINT FOR A CIVIL CASE

### I. The Parties to This Complaint

#### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name      LISA ANTOINE

Street Address      2831 PARKWAY AVE #B

City and County      CHARLOTTE

State and Zip Code      NORTH CAROLINA 28208

Telephone Number      704 287 2558

E-mail Address      linanto801@YAHOO.com

#### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Page 1 of 5

Defendant No. 1

    Name                            ELLIOTTE MANOR

    Job or Title *(if known)*     RYAN ELLIOTTE (OWNER)

    Street Address             10201 CONNELL ROAD

    City and County          MINT HILL

    State and Zip Code     NORTH CAROLINA 28227

    Telephone Number      704 545 1366

    E-mail Address *(if known)*

Defendant No. 2

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 3

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

Defendant No. 4

    Name

    Job or Title *(if known)*

    Street Address

    City and County

    State and Zip Code

    Telephone Number

    E-mail Address *(if known)*

## II.     Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question        ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.     If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

1) 28 USC 1331
2) 28 USC 1391 (b)(1)
3) 28 USC 1343 (a)(1)
4) RULE 803 (1)
5) 28 USC 2072 (b)
6) RULE 8 (a)(2)
7) CIVIL RIGHTS ACT OF 1964
8) HARASSMENT

### B.     If the Basis for Jurisdiction Is Diversity of Citizenship

1.     The Plaintiff(s)

    a.     If the plaintiff is an individual

The plaintiff, *(name)* _____, is a citizen of the State of *(name)* _____.

    b.     If the plaintiff is a corporation

The plaintiff, *(name)* _____, is incorporated under the laws of the State of *(name)* _____, and has its principal place of business in the State of *(name)* _____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.     The Defendant(s)

    a.     If the defendant is an individual

The defendant, *(name)* _____, is a citizen of the State of *(name)* _____. Or is a citizen of *(foreign nation)* _____.

    b.     If the defendant is a corporation

            The defendant, *(name)* _____, is incorporated under

            the laws of the State of *(name)* _____, and has its

            principal place of business in the State of *(name)* _____.

            Or is incorporated under the laws of *(foreign nation)* _____,

            and has its principal place of business in *(name)* _____.

            *(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

    3.     The Amount in Controversy

            The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

a) DEFERMATION OF CHARACTER – $100,000    e) RETALIATION – $25,000
b) SLANDER – $75,000
c) AIDING AND ABETTING – $25,000    $300,000.00
d) HARASSMENT – $75,000

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

SEE ATTACHED

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

SEE ATTACHED

Lisa Antoine
2831 Parkway Avenue #B
Charlotte, NC 28208
704-287-2558

6/8/2018

Western District of North Carolina
401 W. Trade Street
Charlotte, NC 28202

**SECTION 111 OF COMPLAINT --- Statement of Claim**

TO THE ASSIGNED DISTRICT COURT JUDGE:

I Lisa Antoine who resides at the above address declare, I am of firm and competent sound of mind at the time of the incident and as of present and hereby present my statement as briefly as possible to the courts. This complaint brought forth is for an incident which happened at Elliotte Manor while I was hired by the current owner Ryan Elliotte for a full-time job opening as a Medication Technician/CNA.

On April 30th 2017 at about 10:00 am-11:00 am, I was at home when I received a phone call from Ryan Elliotte and was asked to come in to work early to have a meeting about a client's daughter Diann Browning, who had her father Mr.Grant living at the facility. Ryan told me Mr. Grant's daughter was upset and he wanted to talk to me about a few things. I worked the grave-yard shift from 11 pm-7:00 am for that day.

I left for work early and arrived on the premises, and decided to question some of the co-workers who was there before I saw Ryan in order to prepare myself for the matter at hand. I confronted Stacy and Cody about what this meeting was about, and I was told that Mr. Grant's daughter Diann Browning had put up posters within the premises (regular standard typing paper) all over the walls. They continued explaining to me they were in both Building 1 and 2, in the kitchens, day-rooms, halls, and basically everywhere. **I was also informed that what was written on many of these posters was not very pleasant, and was some slanderous, bias, racially inclined, insulting, harassing, and detogatory statements that caused deferrmation of my character which created a typical hostile environment that was plastered everywhere in my work place by an outsider.** They even asked me what I had done to deserve this, since I had only just began working there? I was speechless and had no answer and felt very much ridiculed from the information I had obtained. Even some of the clients at the facility told me the same likewise and I felt so belittled and disgusted and did not know what to say or do. The staff also told me that family members and clients at the facility was very much surprised to see so many posters all over buildings 1 and 2 and wondered why she would put them there saying these

1

types of things with my name on it and she does not your employer.

I finally meet with Ryan and he explained to me the same, that Mr. Grant's daughter had done this at another facility to another staff which Ryan's mother was in charge there. Ryan also told me he took down the other posters, which denied me the privilage of seeing what was exactly said about me, but he did confirm they were some nasty and insulting remarks. He actually admitted that he left the best one up but removed the others and tried to persude me to meet with Mr. Grant's daughter so she can feel comfortable by me to provide her father with his medication. I did not respond because I feel he was not looking out for my best interest, but supported the unacceptable behavior by an outsider to come to the facility to slander and deffer my character as an employee.

**SECTION IV OF COMPLAINT - Relief**

The incident that occured has left me tramitized and I had to resign due to a conflict of interest from me not being able to perform under duress through the actions done at this facility. I was not able to function adequately according to my scope of practice through the slanderous, bias, racial, and humiliating words that led residents and staff member to perceive me with a question mark at my composure.

I dd not feel comfortable staying at that facility and I **demand** that this court make the defendant pay for loss wages, slander, deferring my guinune character, harassment that went on at the workplace, demotion of work hours from 5 days to 3 days a week, and by condoling to the behavior of an outside individual who was not disicplined by management and was allowed to display this unethical behavior in the workplace.

THIS DAY ___11___ OF JUNE, 2018

_Lisa Antoine_
Lisa Antoine      Plaintiff - (Pro-Se)

2

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 6/11/2018

Signature of Plaintiff _Lisa Antoine_

Printed Name of Plaintiff LISA ANTOINE

### B. For Attorneys

Date of signing: _____

Signature of Attorney _____

Printed Name of Attorney _____

Bar Number _____

Name of Law Firm _____

Street Address _____

State and Zip Code _____

Telephone Number _____

E-mail Address _____

RULES USED IN SUPPORT OF THIS CLAIM

1.     28 USC 1331 - FEDERAL QUESTION

2.     28 USC 1391 (b) (1) - VENUE

3.     28 USC 1343 (a) (1) - CIVIL RIGHTS AND ELECTIVE FRANCHISE

4.     RULE 803 (1) - HEARSAY EXCEPTIONS

5.     28 USC 2072 (b) - RULES OF PROCEEDURE AND EVIDENCE

6.     RULE 8 (a) (2) - GENERAL RULES OF PLEADING

7.     CIVIL RIGHTS ACT OF 1964

8.     HARASSMENT

1

Lisa Antoine
2831 Parkway Avenue #B
Charlotte, NC 28208
704-287-2558

6/5/2018

Western District of North Carolina
401 W. Trade Street
Charlotte, NC 28202

### AFFIDAVIT IN SUPPORT OF CLAIM

I Lisa Antoine of sound mind declare that this suit brought forth in this court is of my best belief, and that the facts provided therein are the truth and is not a deviation or of malice towards the defendant.

The facts provided are of my recollection and as to the proceedure and rules of this court and to provide the adequate and substantiated proof and supporting evidence to allow the court to make a clear and precise Judgement.

There is not a lack of proof provided as to the incident which happened at Elliotte Manor during my work at this facility, but only the truth.

This day___5+h___ of June, 2018

_Lisa Antoine_
Lisa Antoine    (Pro-Se)
2831 Parkway Avenue, #B
Charlotte, NC 28208

My Commission Expires

_Michael S Gortney_

MICHAEL S GORTNEY
Notary Public
Gaston Co., North Carolina
My Commission Expires Jan. 21, 2023

1

EXHIBITS USED IN SUPPORT OF THIS CLAIM

1.  EXHIBIT 1 - Initial filing of EEOC within the 90 day period

2.  EXHIBIT 2 - Retainer Agreement of laywer to help in an agreement of claim to the EEOC including fee agreement

3.  EXHIBIT 3 - Charges acknowledged by EEOC through representation of an attorney

4.  EXHIBIT 4 - Statement provided by defendant's attorney to EEOC

5.  EXHIBIT 5 - Schedule to show that the defendant's argument does not corresspond with statement to EEOC claiming I worked on April 26th, 2017; reduced hours in retaliation and accommodation of new hired employees

6.  EXHIBIT 6 - My statement to EEOC exposing and giving a detailed and collective set of facts as to the real incident.

7.  EXHIBIT 7 - Closing of case handled by EEOC with Right to Sue

8.  EXHIBIT 8 - Policies of EEOC and coressponding cases handled and prohibited behavior/practices in the workplace

EXHIBIT 1

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

_____ and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.)<br>**Ms. Lisa Antoine** | Home Phone (Incl. Area Code)<br>**(704) 287-2558** | Date of Birth<br>**12/18/1964** |
|---|---|---|

Street Address      City, State and ZIP Code
**2831 Parkway Avenue, Unit B, Charlotte, NC 28208**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**Elliotte Manor** | No. Employees, Members<br>**15+** | Phone No. (Include Area Code)<br>**(704) 545-1366** |
|---|---|---|

Street Address      City, State and ZIP Code
**10201 Connell Road, Mint Hill, NC 28227**

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

Street Address      City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **2017**    Latest **04/30/2017**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**Statement of Harm:** Elliotte Manor subjected me to discriminatory and disparate treatment on the basis of my race, African American. Specifically, I was the victim of discriminatory treatment and false allegations from a Caucasian resident and that resident's family member (Caucasian). The resident in question made derogatory and racially charged remarks toward me on various occasions, including the use of the term "nigger." I reported my concerns with this treatment to Elliotte Manor, but the company failed to take sufficient remedial action. Rather than investigate or address my concerns, Elliotte Manor's owner (Caucasian) brushed off the issues at hand and allowed the discriminatory environment to persist. Instead, Elliotte Manor retaliated against me for my reports of discriminatory conduct and drastically reduced my hours, resulting in lost wages. As a result of this severe and pervasive disparate treatment, I was forced to separate from Elliotte Manor.

**Statement of Discrimination:** I believe I have been discriminated against on the basis of my race in violation of Title VII of the Civil Rights Act of 1964.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>9/11/17     _Lisa Antoine_<br>Date     Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EXHIBIT 2

## Statement of Client's Rights for Contingency Fees

Before you, the prospective client, arrange a contingent fee agreement with a lawyer, you should understand this statement of your rights as a client. This statement is not a part of the actual contract between you and your lawyer, but, as a prospective client, you should be aware of these rights:

1. There is no legal requirement that a lawyer charge a client a set fee or a percentage of money recovered in a case. You, the client, have the right to talk with your lawyer about the proposed fee and to bargain about the rate or percentage as in any other contract. If you do not reach an agreement with 1 lawyer you may talk with other lawyers.

2. Any contingent fee contract must be in writing and you have 3 business days to reconsider the contract. You may cancel the contract without any reason if you notify your lawyer in writing within 3 business days of signing the contract. If you withdraw from the contract within the first 3 business days, you typically do not owe the lawyer any additional fee although you may be responsible for the lawyer's actual costs during that time. If your lawyer begins to represent you, your lawyer may not withdraw from the case without giving you notice, delivering necessary papers to you, and allowing you time to employ another lawyer. Often, your lawyer must obtain court approval before withdrawing from a case. If you discharge your lawyer without good cause after the 3-day period, you may have to pay a fee for work the lawyer has done.

3. Before hiring a lawyer, you, the client, have the right to know about the lawyer's education, training, and experience. If you ask, the lawyer should tell you specifically about the lawyer's actual experience dealing with cases similar to yours. If you ask, the lawyer should provide information about special training or knowledge and give you this information in writing if you request it.

4. Before signing a contingent fee contract with you, a lawyer must advise you whether the lawyer intends to handle your case alone or whether other lawyers will be helping with the case. If your lawyer intends to refer the case to other lawyers, the lawyer should tell you what kind of fee sharing arrangement will be made with the other lawyers. If lawyers from different law firms will represent you, at least 1 lawyer from each law firm must sign the contingent fee contract.

5. If your lawyer intends to refer your case to another lawyer or counsel with other lawyers, your lawyer should tell you about that at the beginning. If your lawyer takes the case and later decides to refer it to another lawyer or to associate with other lawyers, you should sign a new contract that includes the new lawyers. You, the client, also have the right to consult with each lawyer working on your case and each lawyer is legally responsible to represent your interests and is legally responsible for the acts of the other lawyers involved in the case.

6. You, the client, have the right to know in advance how you will need to pay the expenses and the legal fees at the end of the case. If you pay a deposit in advance for costs, you may ask reasonable questions about how the money will be or has been spent and how much of it remains unspent. Your lawyer should give a reasonable estimate about future necessary costs. If your lawyer agrees to lend or advance you money to prepare or research the case, you have the right to know periodically how much money your lawyer has spent on your behalf. You also have the right to decide, after consulting with your lawyer, how much money is to be spent to prepare a case. If you pay the expenses, you have the right to decide how much to spend. Your lawyer should also inform you whether the fee will be based on the gross amount recovered or on the amount recovered minus the costs.

7. You, the client, have the right to be told by your lawyer about possible adverse consequences if you lose the case. Those adverse consequences might include money that you might have to pay to your lawyer for costs and liability you might have for attorney's fees, costs, and expenses to the other side.



**SPIELBERGER**
**L A W   G R O U P**

8. You, the client, have the right to receive and approve a closing statement at the end of the case before you pay any money. The statement must list all of the financial details of the entire case, including the amount recovered, all expenses, and a precise statement of your lawyer's fee. Until you approve the closing statement your lawyer cannot pay any money to anyone, including you, without an appropriate order of the court. You also have the right to have every lawyer or law firm working on your case sign this closing statement.

9. You, the client, have the right to ask your lawyer at reasonable intervals how the case is progressing and to have these questions answered to the best of your lawyer's ability.

10. You, the client, have the right to make the final decision regarding settlement of a case. Your lawyer must notify you of all offers of settlement before and after the trial. Offers during the trial must be immediately communicated and you should consult with your lawyer regarding whether to accept a settlement. However, you must make the final decision to accept or reject a settlement.

_____
Client Signature

**Lisa Antoine**
Client Name

_____5/8/2017_____
Date

Spielberger Law Group form CRF132 9/11



## LIMITED AUTHORITY TO REPRESENT

**I/WE HEREBY** retain Spielberger Law Group, as my attorneys to represent me in a letter for demand against **Elliotte Manor** or any other person, firm or corporation who, in Spielberger Law Group's determination might be liable as a result of my/our employment thereof.

**THE UNDERSIGNED CLIENT(S)** has/have, before signing this contract, received and read the **STATEMENT OF CLIENT'S RIGHTS**, and understand(s) each of the rights set forth therein. The undersigned client(s) has/have signed the statement and received a signed copy to keep and refer to while being represented by the undersigned attorney(s).

If the attorney has advanced funds to others in representation of the client(s), the attorney is entitled to be reimbursed for such amounts as the attorney has reasonably advanced on behalf of the client(s).

**I/WE UNDERSTAND** that this limited agreement to represent is based upon a **$395** non-refundable flat fee. The total amount due shall be payable at a rate of **$395** with the payment due on the date of this Agreement.

**I/WE HEREBY** agree that Spielberger Law Group's representation is limited only **to pre-litigation matters up to the receipt of a Notice of Right to Sue Letter or otherwise up to the filing of a law suit. Spielberger Law Group is not agreeing to represent me/us in filing a law suit or litigating my/our claims beyond pre-litigation.**

**AS COMPENSATION** for the services of my/our attorneys when a recovery is made, I/we agree to pay my/our attorneys from the total recovery, the following fee:

a.      **BEFORE THE FILING** of a complaint or an answer or the demand for appointment of arbitrators or, if no complaint or answer is filed or no demand for appointment of arbitrators is made, the expiration of the time period provided for such action:

(1)      **40%** of any recovery or settlement.

(2)      A **$35** monthly flat fee for each calendar month in which I/we are represented, starting in the second calendar month of representation, and payable on the same calendar day as the date of this Agreement each month. It is agreed that these monthly flat fees shall be earned immediately.

**Spielberger Law Group** has a security interest in any settlement money obtained on your behalf and as such, the attorney's fee shall be paid first out of any settlement. Our attorney's fee is to be calculated as the gross of all monies received, whether through settlement, judgment, and/or award of attorney's fees.



# SPIELBERGER
## L A W  G R O U P

### BANKRUPTCY

  I have not filed for bankruptcy since the date of the incident in question. If I do file for Bankruptcy before my case is completed, I will disclose my claim to the Bankruptcy Court in my Petition for Bankruptcy, as I am required to do by Federal Law. I will immediately notify **Spielberger Law Group,** of my Bankruptcy by sending them a copy of my Petition for Bankruptcy.

  I/WE AGREE that upon written notice, Spielberger Law Group may terminate its representation under the terms of this Agreement. I/we agree to keep my/our attorneys advised of my/our whereabouts at all times and to cooperate in the preparation and investigation of the case, to appear on reasonable notice for office conferences, depositions and court appearances and to comply with all requests made by my/our attorneys in connection with the preparation and presentation of my/our case.

| | |
|---|---|
| _Lisa Antoine_ | 5/8/2017 |
| CLIENT SIGNATURE | DATE |

(  0703
Social Security Number

**Lisa Antoine**
CLIENT NAME

| | |
|---|---|
| | 5/8/2017 |
| SPIELBERGER LAW GROUP | DATE |



**SPIELBERGER**
**L A W   G R O U P**

---

## ATTORNEY RETAINER SERVICE PAYMENT PLAN

| FIRST NAME | | MIDDLE INITIAL | LAST NAME | | |
|---|---|---|---|---|---|
| Lisa | | | Antoine | | |

| ADDRESS | UNIT # | CITY | | STATE | ZIP |
|---|---|---|---|---|---|
| 2831 Parkway Ave Unit B | | Charlotte | | NC | 28208 |

## PAYMENT PLAN FOR RETAINER

| PAYMENT TYPE | PAYMENT AMOUNT | PAYMENT DATE |
|---|---|---|
| Checking/ACH/Credit | $200 | Upon Receipt |
| Checking/ACH/Credit | $35 | Every Month of Representation |
| Checking/ACH/Credit | $200 | 05/22/2017 |
| | | |
| | | |

## BANKING INFORMATION

BILLING NAME AND ADDRESS (if Different than Client)

| FIRST NAME | MIDDLE INITIAL | LAST NAME |
|---|---|---|
| LISA | R | ANTOINE |

| ADDRESS | UNIT # | CITY | STATE | ZIP |
|---|---|---|---|---|
| 2831 PARKWAY AVENUE | B | CHARLOTTE | NC | 28208 |

*****PAYMENT INFORMATION – MUST BE FULLY COMPLETED WITH PAYMENT METHOD AND ACCOUNT NUMBERS*****

| BANK NAME | | |
|---|---|---|
| CAPITAL ONE | | |
| 9 DIGIT BANK ROUTING NUMBER | CHECKING ACCOUNT NUMBER | |

| CREDIT/DEBIT CARD NUMBER | EXPIRATION DATE | SECURITY CODE |
|---|---|---|
| 4003 4485 8507 4933 | 09/21 | 835 |

## ACKNOWLEDGEMENT

I (We) hereby authorize payments to be withdrawn according to the amounts and scheduled times outlined above in the payment plan section from my checking/savings account. I also understand that if I wish to change any of the draft dates, I have to notify Spielberger Law Group at least three business days prior to a payment due date. I also understand that I will be subject to a minimum $25 NSF fee should a check not clear or a credit card transaction not authorize on any of the above payment dates. Spielberger Law Group assumes no liability for any additional expenses you incur as a result of non-sufficient/available funds.

Client Name: _____ Lisa Antoine _____

CLIENT SIGNATURE: _Lisa Antoine_ DATE: 5/8/17    SLG REPRESENTATIVE NAME: _____

CLIENT SIGNATURE: _Lisa Antoine_ DATE: 5/8/17


# SPIELBERGER
## L A W  G R O U P

### ATTORNEY RETAINER SERVICE PAYMENT PLAN

| FIRST NAME | MIDDLE INITIAL | LAST NAME |
|---|---|---|
| Lisa | | Antoine |

| ADDRESS | UNIT # | CITY | STATE | ZIP |
|---|---|---|---|---|
| 2831 Parkway Ave Unit B | | Charlotte | NC | 28208 |

### PAYMENT PLAN FOR RETAINER

| PAYMENT TYPE | PAYMENT AMOUNT | PAYMENT DATE |
|---|---|---|
| Checking/ACH/Credit | $400 | PAID |
| Checking/ACH/Credit | $35 | Every Month of Representation |
| | | |
| | | |
| | | |

### BANKING INFORMATION

BILLING NAME AND ADDRESS (If Different than Client)

| FIRST NAME | MIDDLE INITIAL | LAST NAME |
|---|---|---|
| LISA | R | ANTOINE |

| ADDRESS | UNIT # | CITY | STATE | ZIP |
|---|---|---|---|---|
| 2831 PARKWAY AVE | B | CHARLOTTE | NC | 28208 |

### ▼▼ *****PAYMENT INFORMATION – MUST BE FULLY COMPLETED WITH PAYMENT METHOD AND ACCOUNT NUMBERS***** ▼▼

| BANK NAME | |
|---|---|
| BB&T | |
| 9 DIGIT BANK ROUTING NUMBER | |
| 053101121 | 1152 |

| CREDIT/DEBIT CARD | EXPIRATION DATE | SECURITY CODE |
|---|---|---|
| 4661-8800-6241-3700 | 05/21 | 971 |

### ACKNOWLEDGEMENT

I (We) hereby authorize payments to be withdrawn according to the amounts and scheduled times outlined above in the payment plan section from my checking/savings account. I also understand that if I wish to change any of the draft dates, I have to notify Spielberger Law Group at least three business days prior to a payment due date. I also understand that I will be subject to a minimum $25 NSF fee should a check not clear or a credit card transaction not authorize on any of the above payment dates. Spielberger Law Group assumes no liability for any additional expenses you incur as a result of non-sufficient/available funds.

Client Name: _____ Lisa Antoine _____

CLIENT SIGNATURE: _Lisa Antoine_ DATE: 8-7-17    SLG REPRESENTATIVE NAME: _____

CLIENT SIGNATURE: _____ DATE: _____

EXHIBIT 3



## U.S. Equal Employment Opportunity Commission
## Charlotte District Office

129 W. Trade Street
Suite 400
Charlotte, NC 28202
(704) 344-6682
TDD: 1-800-669-6820
Fax: (704) 954-6410
1-800-669-4000

Respondent: ELLIOTTE'S MANOR, LLC
EEOC Charge No.: 430-2017-02086

Jason A. Watson, Esq.
Spielberger Law Group 2
202 S. Hoover Blvd
Tampa, FL 33609

**AUG 2 1 2017**

Dear Mr. Watson :

This is to acknowledge receipt of the above-numbered charge of employment discrimination against the above-named respondent. Please use the "EEOC Charge No." listed above whenever you call us about this charge. The information provided indicates that the charge is subject to:

| | |
|---|---|
| [X] | Title VII of the Civil Rights Act of 1964 (Title VII) |
| [ ] | The Age Discrimination in Employment Act (ADEA) |
| [ ] | The Americans with Disabilities Act (ADA) |
| [ ] | The Equal Pay Act (EPA) |
| [ ] | The Genetic Information Nondiscrimination Act (GINA) |

You need do nothing further at this time. We will contact you when we need more information or assistance. A copy of the charge or notice of the charge will be sent to the respondent within 10 days of our receipt of the charge as required by our procedures.

The quickest and most convenient way to obtain the contact information and the status of your charge is to use EEOC's Online Charge Status System, which is available 24/7. You can access the system via this link (https://publicportal.eeoc.gov/portal) or by selecting the "My Charge Status" button on EEOC's Homepage (www.eeoc.gov). To sign in, enter your EEOC charge number, your zip code and the security response. An informational brochure is enclosed that provides more information about this system and its features.

While the charge is pending, this office should be notified of any change in your client's address, or where they can be reached if they have any prolonged absence from home. Your cooperation in this matter is essential.

Sincerely,

Philippe O. Pelsenhardt
Investigator
(704) 954-6452

Office Hours: Monday – Friday, 8:30 a.m. - 5:00 p.m.
www.eeoc.gov

Enclosure(s):     cc: Lisa R. Antoine
                  2834 Parkway Avenue, Unit B
                  Charlotte, NC 28208

EXHIBIT 4

N. Kyle Hicks
James C. Wrenn, Jr.
Holly W. Batten
Gerald T. Koinis
C. Gill Frazier, II

LAW OFFICES OF

# HOPPER, HICKS & WRENN, PLLC

**Telephone: (919) 693-8161**
www.hopperhickswrenn.com

Oxford Office:
PO Box 247
111 Gilliam Street
Oxford, NC 27565
Creedmoor Office:
PO Box 686
106 W. Church St., Ste. E
Creedmoor, NC 27522

November 29, 2017

Ms. Hattie W. Murphy
Federal Investigator
Equal Employment Opportunity Commission
Charlotte District Office
129 W. Trade Street, STE 400
Charlotte, NC 28202

Re:  Employer:          Elliotte's Manor, LLC
     Charging Party:    Lisa R. Antoine
     EEOC Charge No.:   430-2017-02086
     Response Date:     November 29, 2017

Dear Ms. Murphy:

We are writing on behalf of our client, Elliotte's Manor, LLC ("Elliotte's Manor" or "Responding Party"), in response to Lisa R. Antoine's ("Charging Party") allegation that she was Discriminated against because of her race, Black, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

## A.    The Allegations.

The Charging Party alleges that Elliotte's Manor "subjected [her] to discriminatory and disparate treatment on the basis of [her] race" and "[r]ather than investigate or address [her] concerns...Elliotte Manor retaliated against [her] for [her] reports of discriminatory conduct and drastically reduced [her] hours" forcing her to lose wages and eventually separate from her employment with Elliotte's Manor.

## B.    Response to the Allegations.

The Responding Party denies the Allegations in their entirety. In support of this denial, the Responding Party shows the following:

### 1.    Summary

Elliotte's Manor did not subject Charging Party to discriminatory or disparate treatment while she was employed with Elliotte's Manor nor did Elliotte's Manor retaliate against Charging

Party for her reports of discriminatory conduct. An incident occurred between one of Elliotte's Manor's residents (the "Resident") and Charging Party during Charging Party's shift on or about April 26, 2017. On April 30, 2017, the Resident's daughter (the "Daughter") posted a note directing that Charging Party not be allowed to enter the Resident's room. Immediately after being notified of the incident and the posting of the note, Elliotte's Manor began investigating the matters. Just prior to the incident, Charging Party asked to be transferred from third shift to second shift. After the incident, Charging Party requested that she be returned to third shift. Elliotte's Manor had already filled the vacancy left by Charging Party's transfer to second shift and full time third shift work was not available. Charging Party told Ryan Elliotte that part-time work was acceptable because she wanted to go back to school to become a pharmacy technician (See text message dated May 2, 2017 attached as "Exhibit A"). Elliotte's Manor did not reduce Charging Party's hours based upon her allegations. Before Elliotte's Manor could conclude its investigation, Charging Party notified Elliotte's Manor of her resignation on May 4, 2017, effective immediately.

2.   Background on Elliotte's Manor/Responding Party

Elliotte's Manor operates two family care homes, Elliotte's Manor #1 and Elliotte's Manor #2 located on adjacent properties in Charlotte, North Carolina, each of which is licensed to care for up to six residents. The Resident resided in Elliotte's Manor #1 at the time of the incident. Family care homes are licensed pursuant to Article 1, Chapter 131D of the North Carolina General Statutes and are adult care homes which care for between two and six residents. See N.C. Gen. Stat. §131D-2.1(9). An adult care home is defined as

> An assisted living residence in which the housing management provides 24-hour scheduled and unscheduled personal care services to two or more residents, either directly or for scheduled needs, through formal written agreement with licensed home care or hospice agencies. Some licensed adult care homes provide supervision to persons with cognitive impairments whose decisions, if made independently, may jeopardize the safety or well-being of themselves or others and therefore require supervision. Medication in an adult care home may be administered by designated trained staff. Adult care homes that provide care to two to six unrelated residents are commonly called family care homes.

N.C. Gen. Stat. §131D-2.1(3).

Ryan Elliotte is the manager of Elliotte's Manor and is the head supervisor of all employees. Upon an employee's hiring, Elliotte's Manor staff makes sure that new employees are trained on the residents' individual needs. A vital component of Elliotte's Manor's training protocol is to introduce new hires to current residents and to explain to the new hires the tendencies and characteristics of the residents. Elliotte's Manor prides itself on being able to cater to the specific needs of its residents in a home-like setting. Employees of Elliotte's Manor are not specifically assigned to one building or other. Instead, to fairly distribute the respective workloads of its employees, Elliotte's Manor rotates its employees between its two buildings.

3.   The facts surrounding the Charging Party's resignation are as follows:

Charging Party was originally hired by Elliotte's Manor to work third shift, or night shift, on March 18, 2017. Charging Party exclusively worked third shift until requesting that she be transferred to second shift. After Charging Party requested to have her schedule changed so that she could work second shift, Ryan Elliotte granted Charging Party's request and scheduled her for second shift. Elliotte's Manor hired staff to fill Charging Party's position on third shift. Because Charging Party had worked both second and third shifts for Elliotte's Manor, she was oriented to the residents' different needs during both shifts. As part of this orientation, Charging Party was informed about each of the residents' personal characteristics including each resident's care needs and habits. Charging party was specifically told that the Resident was active at night due to his history as a night security guard.

On or about April 26, 2017, during one of Charging Party's third shift assignments, the Charging Party and the Resident allegedly exchanged words and the Resident allegedly made a comment (or comments) to the Charging Party which was racially insensitive (the "Incident"). As explained below management at Elliotte's Manor was not made aware of the Incident by the Charging Party or the Resident, but instead learned about the Incident on April 29, 2017 from the Daughter. The Resident is a retired night shift employee who tends to rest during the daytime and is more alert at night. The Resident is an elderly individual who is known to be irritable unless staff members spend time with him. Naturally, because he is alert while other residents are asleep, the Resident requires more attention than most residents during third shift. The night of the Incident, which was scheduled to be Charging Party's last night on third shift before her permanent transfer to second shift, the Resident purportedly asked for medication for a headache. The Charging Party was the employee responsible for taking care of the Resident on the night of the Incident. Apparently, the Resident's request for medication was not fulfilled in a manner satisfactory to the Resident and the Resident became frustrated with the Charging Party's reaction to the request. This caused the Resident and the Charging Party to exchange words. Allegedly, the Resident used racially insensitive language, including the "N" word, in speaking to the Charging Party.

Responding Party was notified about the Incident by the Daughter on April 29, 2017. Responding Party immediately (the next day, on or about April 30, 2017) reviewed its video surveillance and could tell that there appeared to be a verbal exchange and that both the Charging Party and Resident appeared frustrated. The video surveillance did not include audio. While the Charging Party was working second shift on or about April 27, 2017, the Resident pointed out to the Daughter that the Charging Party was the employee that he had had an issue with during her third shift on or about April 26, 2017. The Daughter then called Ryan Elliotte to inquire about the Incident at approximately 10:00 pm on April 29, 2017. She explained that the Resident told her that Charging Party became angry with him when he disturbed her to ask for headache medication, was slow to respond to his needs, and made it clear that he should be asleep and not disturbing her. Until receiving this call from the Daughter, Ryan Elliotte was unaware of the incident. Ryan Elliotte informed the Daughter that he would investigate the incident. He proposed that he meet with the Daughter and Charging Party. When he mentioned the Incident to the Charging Party, she made him aware of her allegations that the Resident had addressed her in a racially derogatory manner.

After her conversation with Ryan Elliotte, the Daughter then unilaterally decided to post notes (the "Notes") in the building where the Resident was located informing staff that the Charging Party was not allowed in the Resident's room until further notice (see attached Note which is marked as "Exhibit B"). The Daughter posted one note in the hallway (the "Common Area") and one note in the Resident's room. The Daughter acted on her own with no direction from Responding Party. The Notes were not found by Responding Party until 7:30 am on April 30, 2017, the following morning, when another employee called Ryan Elliotte to inform him of the Notes. The Note in the Common Area was then taken down immediately by Responding Party. The Note in the Resident's room was taken down the following day. Ryan Elliotte then had a conversation with the Daughter to notify her that her actions were unacceptable and would not be tolerated in the future. Ryan Elliotte scheduled a date for Charging Party and the Daughter to meet to discuss both the Daughter's and the Charging Party's concerns. Charging Party and Daughter agreed to meet on May 8, 2017. Elliotte's Manor never indicated that this meeting was mandatory for Charging Party. Four days before the scheduled meeting, on May 4, 2017, Charging Party tendered her resignation and noted that it would be "effective today".

## C.  No Evidence of Unlawful Discrimination by Responding Party.

Charging Party cannot establish the elements of a prima facie case of racial discrimination on these facts. Elliotte's Manor is an equal opportunity employer with a diverse workforce. Currently, Responding Party has seventeen (17) employees, nine (9) of whom are African-American. The Responding Party does not tolerate or condone discrimination based on race. As stated above, Charging Party's allegation that she was subjected to discriminatory treatment during her employment is without merit. Responding Party immediately acted once informed about the Incident with Resident. Moreover, there is no evidence whatsoever that Elliotte's Manor took any adverse action against Charging Party because of her race, and much evidence to the contrary.

First, the undisputed evidence is that Ryan Elliotte investigated the Incident with Charging Party as soon as he became aware of the situation. Ryan Elliotte communicated with the Charging Party as soon as he was notified on the incident. He conducted staff interviews and resident interviews after receiving Charging Party's allegations. Furthermore, Ryan Elliotte reviewed the video surveillance located at the facility.

Elliotte's Manor had no part in posting the Notes. As soon as Elliotte's Manor management was alerted to the situation, the Note in the Common Area was removed. Specifically, Ryan Elliotte made it clear to the Daughter that the Note was unacceptable. Further, he had separate discussions with the Charging Party during which he made it clear that he had addressed the posting of the Note and that he did not condone the Daughter's actions.

Elliotte's Manor strives to provide its employees with a work environment that is free from discriminatory intimidation, ridicule, and insult. Because Elliotte's Manor serves elderly individuals, some of whom have mental capacity issues, employees are taught in their training that some residents may be difficult to manage. Whenever a situation reaches the level of becoming hostile or offensive for an employee, Elliotte's Manor encourages its employees to alert management so that proper action(s) can be taken. Elliotte's Manor investigates complaints of

discrimination to make sure that its employees are able to work in a nondiscriminatory work environment. While Elliotte's Manor cannot prevent residents, all of whom are elderly and some of whom suffer mental impairments, from occasionally using inappropriate language towards its employees, Elliotte's Manor addresses such resident behavior with the resident in question and/or the resident's responsible party. Staff are not reassigned based on a resident's race-based preferences.

Elliotte's Manor did not reduce Charging Party's hours because of the Incident. Charging Party requested to be moved from third shift to second shift. Her first day on second shift, April 27, 2017, was the day the Resident's Daughter confronted her about the alleged Incident. The Charging Party asked to be returned to third shift. Ryan Elliotte informed her that her position on third shift had been filled and that he did not have a full-time position available for her on third shift at that time. She responded by indicating that a part-time position was acceptable because she wanted to go back to school to become a pharmacy technician. All of the events described happened over approximately a nine (9) day period. Elliotte's Manor was never given an opportunity to work her back in to a full-time position on third shift.

### D.  Conclusion

The foregoing discussion and the attached evidence show that the Charging Party was not subjected to discrimination while employed with Elliotte's Manor. Charging Party voluntarily requested to change shifts, then requested to be changed back to third shift after additional staff had been hired to fill her position. She informed Ryan Elliotte that she had no objection to part-time work because she intended to go back to school. She then voluntarily resigned. Responding Party attempted to understand and resolve any issues Charging Party may have had at work. Unfortunately, Charging Party did not give the Responding Party a chance to ultimately finalize its investigation. Instead, she resigned without providing Elliotte's Manor with any notice. Accordingly, Responding Party respectfully requests that the Commission dismiss this Charge and issue a dismissal and notice of rights with respect to Charging Party's claims.

If you require any additional information, please let us know. We look forward to receiving the Commission's decision in this matter.

Sincerely,

James C. Wrenn, Jr.

Counsel for Responding Party

Enclosure(s)

**Exhibit "A"**

**Text Messages Dated May 2, 2017 from Charging Party to Ryan Elliotte of Responding Party and Ryan Elliotte's Response**

{A0144024.DOCX}                                        6

**Text Message**
**Tue, May 2,** 9:45 PM

where is the schedule?

No need to change my schedule again, I will stay part time, because I'm going back to school for Pharmacy tech.

Great! I wish you the best. You will do great 👍 You are scheduled Thur from 11-7. I'm sorry but I left the schedule at the job on accident. Muna is still at work. See if she is willing to text you a picture of the schedule. God bless

Exhibit "B"

Note Posted by Diann Browning, Daughter of Resident on April 30, 2017

{A0144024.DOCX}                                                    7

# Important

Until further notice AND resolution of conflict, staff member (s)

_Lisa Antion_

is not to enter Grant's room except in cas of emergency or upon invitation by Grant

Diann Browning

April 30, 2017

# EXHIBITS

HARDWORK * HAPPY EASTER !!! **

SHIFT

| Name | SAT 8 | SUN 9 | MON 10 | TUE 11 | WED 12 | THUR 13 | FRI 14 | SAT 15 | SUN 16 | MON 17 | TUE 18 | WED 19 | THUR 20 | FRI 21 | SAT 22 | SUN 23 | MON 24 | TUE 25 | WED 26 | THUR 27 | FRI 28 | SAT 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April | | | | | | | | | | | | | | | | | | | | | | |
| 1 Veronica | 7/3 (2) | 7/3 (1) | | 7/3 (2) | 7/3 (1) | 7/3 (2) | 7/3 (1) | | | 7/3 (2) | 7/3 (1) | 7/3 (2) | 7/3 (1) | | 7/3 (2) | 7/3 (1) | | 7/3 (2) | 7/3 (1) | 7/3 (2) | 7/3 (1) | |
| Felicia | 7/3 (2) | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (2) | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (2) | |
| Vera | | | 7/3 (1) | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (1) | | | 7/3 (1) | 7/3 (2) | 7/3 (2) | | | 7/3 (1) | 7/3 (1) | 7/3 (2) | | | 7/3 (1) |
| Tana | | | 9/5 | 9/5 | 9/5 | 9/5 | | 7/3 (2) | 7/3 (2) | 9/5 | 9/5 | 9/5 | 9/5 | | | | 9/5 | 9/5 | 9/5 | 9/5 | | 7/3 (2) |
| 2 Tammy | 3/11 (1) | 3/11 (1) | | 3/11 (1) | 3/11 (2) | 3/11 (1) | 3/11 (1) | | | 3/11 (1) | 3/11 (1) | 3/11 (2) | 3/11 (1) | | 3/11 (1) | 3/11 (1) | | 3/11 (1) | 3/11 (2) | 3/11 (1) | 3/11 (1) | |
| Lisa E | | | 3/11 (1) | 3/11 (2) | 3/11 (1) | 3/11 (2) | | 3/11 (1) | 3/11 (1) | | 3/11 (2) | 3/11 (1) | 3/11 (2) | 3/11 (1) | | | 3/11 (1) | 3/11 (2) | 3/11 (1) | 3/11 (2) | | 3/11 (1) |
| Stacy | 3/11 (2) | 3/11 (2) | 3/11 (2) | | | | 3/11 (2) | 3/11 (2) | 3/11 (2) | 3/11 (2) | | | | 3/11 (2) | 3/11 (2) | 3/11 (2) | 3/11 (2) | | | | 3/11 (2) | 3/11 (2) |
| 3 Carolyn | 11/7 (2) | 11/7 (2) | | 11/7 (2) | 11/7 (2) | 11/7 (2) | 11/7 (2) | | | 11/7 (2) | 11/7 (2) | 11/7 (2) | 11/7 (2) | | 11/7 (2) | 11/7 (2) | | 11/7 (2) | 11/7 (2) | 11/7 (2) | 11/7 (2) | |
| Crystal | 11/7 (1) | 11/7 (1) | 11/7 (2) | | 11/7 (1) | 11/7 (1) | 11/7 (1) | | | 11/7 (1) | 11/7 (1) | 11/7 (1) | | 11/7 (2) | 11/7 (1) | 11/7 (1) | 11/7 (2) | | 11/7 (1) | 11/7 (1) | 11/7 (1) | |
| Lisa A | | | 11/7 (1) | 11/7 (1) | | 9*/5 (2) | 11/7 AM | 11/7 (1) | 11/7 (1) | | 11/7 AM | 130/930 (2) | 11/7 (1) | 11/7 (1) | | | 11/7 (1) | 11/7 (1) | | 9*/5 (2) | 11/7 AM | 11/7 (1) |
| | | | | | | | | | | | | | | | | | | | | | | |
| Ryan | | | | | | | | 11/7 (2) | 11/7 (2) | | | | | | | | | | | | | 11/7 (2) |
| Olga | 7/3 (1) | 7/3 (2) | | 7/3 (1) | 7/3 (2) | 7/3 (1) | 7/3 (2) | | | 7/3 (1) | 7/3 (2) | 7/3 (1) | 7/3 (2) | | 7/3 (1) | 7/3 (2) | | 7/3 (1) | 7/3 (2) | 7/3 (1) | 7/3 (2) | |
| Cody | | | 7/3 P | 11/7 | 11/7 | 11/7 | | 11/7 | 11/7 | 7/3 P | | 11/7 | 11/7 | 11/7 | | | 7/3 P | 11/7 | 11/7 | 11/7 | | |
| Annie | 9/3 | | 9/3 | 9/3 | | 9/3 | 9/3 | | | 9/3 | 9/3 | | 9/3 | | 9/3 | | 9/3 | 9/3 | | 9/3 | 9/3 | |
| Amy | | | | 7/12 | 7/12 | 7/12 | 7/12 | | | | 7/12 | 7/12 | 7/12 | 7/12 | | | | 7/12 | 7/12 | 7/12 | 7/12 | |
| Jose | | | 3/530 | 3/530 | 3/530 | 3/530 | 3/530 | | | 3/530 | 3/530 | 3/530 | 3/530 | 3/530 | | | 3/530 | 3/530 | 3/530 | 3/530 | 3/530 | |

**SHIFT**

| Name | SUN 30 | MON 1 | TUE 2 | WED 3 | THUR 4 | FRI 5 | SAT 6 | SUN 7 | MON 8 | TUE 9 | WED 10 | THUR 11 | FRI 12 | SAT 13 | SUN 14 | MON 15 | TUE 16 | WED 17 | THUR 18 | FRI 19 | SAT 20 | SUN 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April-May #1 | | | | | | | | | | | | | | | | | | | | | | |
| Veronica | | | | | | | | | | | | | | | | | | | | | | |
| Tommy | | | | | | | | | | | | | | | | | | | | | | |
| Vera | | | | | | | | | | | | | | | | | | | | | | |
| Tona | | | | | | | | | | | | | | | | | | | | | | |
| Renee | | | | | | | | | | | | | | | | | | | | | | |
| Lisa (2nd) | | | | | | | | | | | | | | | | | | | | | | |
| Stacy | | | | | | | | | | | | | | | | | | | | | | |
| Alice | | | | | | | | | | | | | | | | | | | | | | |
| Bryon | | | | | | | | | | | | | | | | | | | | | | |
| Lorraine | | | | | | | | | | | | | | | | | | | | | | |
| Carolyn #3rd | | | | | | | | | | | | | | | | | | | | | | |
| Crystal | | | | | | | | | | | | | | | | | | | | | | |
| Lisa A | | | | | | | | | | | | | | | | | | | | | | |
| Stacy / Cody | | | | | | | | | | | | | | | | | | | | | | |
| Amy | | | | | | | | | | | | | | | | | | | | | | |
| Olga | | | | | | | | | | | | | | | | | | | | | | |
| Anne | | | | | | | | | | | | | | | | | | | | | | |
| New hire | | | | | | | | | | | | | | | | | | | | | | |

EXHIBIT 6

Lisa Antoine
2831 Parkway Avenue #B
Charlotte, NC 28208
(704)287-2558

12/03/2017

Ms. Hattie W. Murphy
Federal Investigator
Equal Employment Opportunity Commission
Charlotte District Office
129 W. Trade Street, STE 400
Charlotte, NC 28202

EEOC Charge No: 430-2017-02086

**RE: Statement in Response to Elliotte Manor LLC to ensure a proper Investigation.**

Dear Ms. Murphy:

I am writing you this full statement in response to the your ongoing investigation to address the matter to it's fullest attention. I made this complaint prior to it reaching your desk in order to come to a resolution but unfortunately Elliotte Manor LLC refused to mediate with my legal assistant firm. My representing attorney has been aware of this issue since May 8th of 2017 and there appears to be no resolution in sight. I was told by a worker at your office that Elliotte Manor LLC has decided to settle, but I am not too sure of that. Instead an attorney has submitted a statement to your office in response to your ongoing Investigation, and I am going to take the opportunity to allow you to know in full detail of all the events.

**A.     ADDRESSING THE ISSUE**

I Lisa Antoine worked at Elliotte Manor LLC from March 18th 2017 until I fully resigned from a hostile environment. Before I was hired I was interviewed by Tanna who was the interviewer or the hiring manager who is no longer there. Later I met with Ryan Elliotte (Defendant) who hired me. I did and completed the necessary paperwork for the job I applied, which was full-time on 3rd shift (11pm-7am).

I have been a CNA for over 17 years and I have always kept a professional appearance, did my job with a good heart, follow appropriate orders, completed tasks within reasonable time, and always showed respect for the elderly, disabled, and less fortunate.

1

**Listed below are my points concerning the truth of the present matter at hand, and I shall point the out:**

1.      Upon being interviewed by Tanna I had a second interview which was done by Ryan Elliotte. During this second interview Ryan Elliotte handed me a packet and I signed some other documents, which I was not given a copy of. I did not have an orientation class but only had a second interview with Ryan Elliotte. During this second interview Ryan Elliotte did explain to me what was in the packet and informed me of it's contents. Ryan Elliotte also explained to me there would be a drop in pay to minimum wage if a (2) week notice was not given if I do decide to resign. He told me that this (2) weeks advance resignation notice could be in any manner written or verbal. This second interview occurred before I was actually hired.

2.      During this second interview I was not given any information of any residents or any special needs or personal needs or any requirements towards any residents within the facility, because I was not on staff as yet. After this second interview I was hired and there was no orientation class to be informed of the facility, staff, residents, or resident family members.

The following are discrepancies that are included in Elliotte's Manor LLC statement to the EEOC:

1.      In the statement provided by the defendant Elliotte Manor LLC, it stated, " I had attended an orientation that was given and I was told of residents needs." This statement is false.

2.      In the statement provided by the defendant Elliotte Manor LLC, it states, "I did work on or about April 26th 2017." This statement is false.

3.      In the statement provided by the defendant Elliotte Manor LLC, it states, "Resident Mr. Grant approached me for pain medication on April 26th 2017." This is false.

4.      In the statement provided by the defendant Elliotte Manor LLC, it states, "Mr. Grant and myself had an argument when he viewed the footage of the camera." This statement is false.

5.      In the statement provided by the defendant Elliotte Manor LLC, it states, "Mr. Grant's daughter approached me after her father pointed me out on April 27th 2017." this statement is false.

6.      In the statement provided by the defendant Elliotte Manor LLC, it states, "I spoke to Mr. Grant's daughter Diann Browning prior to her posting note(s)." This statement is false.

7.      In the statement provided by the defendant Elliotte Manor LLC, it states, "I worked on 2nd shift on April 26th – April 27th 2017." This statement is false.

8.     In the statement provided by the defendant Elliotte Manor LLC, it states. "I asked to be changed from 3rd shift to 2nd shift." This statement is false.

9.     In the statement provided by the defendant Elliotte Manor, LLC, it states, "I refused Mr. Grant his medication and I did not perform my job duties." This statement is false.

10.     In the statement provided by the defendant Elliotte Manor, LLC, it states, " My effective day of resignation was May 4th 2017." This statement is false. My effective date of resignation was May 2nd 2017.

## B.     EXPANATION OF EVENTS AS THEY HAPPENED

From the start of my employment at Elliotte Manor LLC, I admit it was a learning experience and I adopted very well. I learnt of all the necessary residents needs, wants, care plans, and accommodations after I was hired. I was not informed of any residents potential precise accommodations or faults, or behavior during my second interview done by Ryan Elliotte. My observation and questions that I asked enabled me to understand all residents after my second interview. I was not informed and I never knew resident Mr. Grant had a problem of pacing the floors in the hallways because of his prior occupation as a security guard. I thought some residents do it for exercise because at other facilities they all say that. This is the first time I am hearing that about Mr. Grant, and according to policy of the State of North Carolina, patients or residents information are to remain confidential.  From this statement mentioned in the defendant's letter to the EEOC this is a violation of the Ethics, Rules and Regulation of Patients Rights which are to remain confidential at all times.

1.(a)     On or about April 26th 2017 as stated by the defendant Elliotte Manor LLC, they claimed that I was scheduled to work on 2nd shift. According to the schedule I have, I was not scheduled to work and I did not work. I was off that day and I did not come to the facility on that day. See(EXHIBIT A) There were no comments exchanged between myself and resident Mr. Grant because I was not there.  He never asked me for any pain medication because I was not there on the premises. I did not neglect my job duties because I was not there. So it is impossible for the defendant Elliotte Manor LLC to say there is video footage of me on the premises when I did not work. On April 25th 2017 cannot be used as an alibi due to the fact that I worked 3rd shift (11Pm-7am) and the defendant claimed the assumed incident occurred on 2nd shift (3pm-11pm).

The statement provided by defendant Elliotte Manor LLC states, Mr. Grant approached me for his pain medication and I told Ryan Elliotte, that Mr. Grant had addressed me in a racially detogatory manner. I have not discussed anything of this nature to Ryan Elliotte at no point in

3

time. There is no video footage showing nothing of the sought because I was not on the premises and I did not work that day because it never happened.

(b)    On April 27th 2017 according to the defendant Elliotte Manor LLC, they stated that Mr. Grant's Daughter Diann Browning approached me after resident Mr. Grant pointed me out to his daughter after Mr. Grant told his daughter I refused to give him his medication. According to the schedule I have I worked as a housekeeper from (9am-5pm) and I worked in Building 2. Resident Mr. Grant resides in Building 1 so this is a false statement and a lie. Mr. Grant's daughter did not approach me because I did not work on April 26th 2017 for any information to have been related to his daughter. I did nothing for Mr. Grant's daughter to approach me and when I worked on April 27th 2017 Mr. Grant's Daughter Diann Browning did see me that day and I did not see her. Defendant Elliotte Manor LLC also claimed I worked on 2nd shift (3pm-11pm) on April 27th 2017, when I was working a regular 9 to 5 shift.

(c)    Defendant Elliotte Manor LLC has claimed that I requested to be put on 2nd shift (3pm-11pm) from 3rd shift (11pm-7pm). According to the EXHIBIT(text message) presented by the defendant Elliotte Manor LLC, it shows this request was made on May 2nd 2017, but the defendant implied in their statement that I made this request sometime during April 25th -26th 2017 and said I worked on April 26th 2017 and April 27th 2017 on 2nd shift. This statement is false and it was presented to the EEOC in this matter. I worked right through the month of April 2017 on 3rd shift (11pm-7am) except when doing housekeeping during (9am-5pm). See my (EXHIBIT A)

2.(a)    At the time of the real incident that I first reported to my legal assistant firm which occurred on April 30th 2017 where the issue actually started defendant Ryan Elliotte only had (3) African Americans working at the facility. We all worked the graveyard shift (11pm-7am) and the schedule I have shows the times we all worked. All the names listed on the 3rd shift are African American. Only fill-ins for days off are listed as Caucasian workers. (EXHIBIT A)

Elliotte Manor LLC has claimed this incident has been going on for (9) days which is a false statement, and defendant Ryan Elliotte claimed that when the assumed incident occurred, I did not report it to him, when there was nothing at all to report. The real incident occurred on or about April 29th 2017 and defendant Ryan Elliotte cannot file an incident report concerning events that was assumed to have happen on April 26th 2017. (EXHIBIT B) Mr. Grant nor his Daughter Diann Browning did not file an incident or grievance report as alleged on April 26th - 27th 2017, because there was none to be filed.

What really happened starting on April 29th 2017 is that I was scheduled to work 3rd shift (11pm-7am) and I was called by defendant Ryan Elliotte earlier during the day and I was asked

by Ryan Elliotte, "if I wanted to work on 2nd shift (3pm-11pm) because somebody wasn't coming to work at that shift on that day?" I agreed to work 2nd shift (3pm-11pm) for that day only which was April 29th 2017. When I went to work on April 29th 2017 for 2nd shift (3pm-11pm), defendant Ryan Elliotte called one of the CNA'S (Certified Nursing Assistant) and requested that I be trained by CNA Stacy Cosgrove, since I wasn't trained for 2nd shift and I never worked that shift. Stacy Cosgrove worked at Elliotte Manor LLC prior to my hire and she stolen some controlled substance from off the cart. Defendant Ryan Elliotte had her train me for 2nd shift (3pm-11pm) since I had never worked it before. Defendant Ryan Elliotte kept CNA Stacy Cosgrove on staff did not fire her and gave her a raise despite her incident but she is not supposed to handle any kind of medications , and she personally told me that. Defendant Ryan Elliotte never reported the incident with CNA Stacy Cosgrove to the proper authorities which is a violation of the Law. Question: Both Stacy Cosgrove and defendant Ryan Elliotte are both Caucasian, and he has showed favor towards her after she did a criminal act. Is this Discrimination or what?

On that day April 29th 2017 while I was passing medication out to the residents during the training of Stacy Cosgrove, we came to resident Mr. Grant's room. Stacy Cosgrove assisted me in dispensing Mr. Grant's medication while we were in the hallway. I went into Mr. Grant's room and knocked and walked in where he was lying on the bed. I offered him his medication by addressing him by name politely, after I introduced myself to him. Mr. Grant refused his medication, and stated he had just come from the doctor earlier and he had gotten his medication. I came out of Mr. Grant's room and told Stacy Cosgrove who was standing in the hallway by the door, that Mr. Grant refused his medication. Stacy Cosgrove who is not supposed to touch medication due to her prior incident, took the medication from me and went into Mr. Grant's room. I observed Stacy Cosgrove give Mr. Grant his medication and she with an empty cup. That was the only time for April 29th 2017 had had spoken to Mr. Grant during the entire shift.

(b)       After doing 2nd shift on April 29th 2017, I went home and during the day when I was asleep I received a phone call on April 30th 2017n at about 10:00am-11:00am from defendant Ryan Elliotte. Ryan Elliotte told me that Mr. Grant's daughter Diann Browning had put up some posters all over building 1 and building 2, and she had called him and she was very upset. According to the statement Elliotte Manor LLC to the EEOC, it stated that Mr. Grant's daughter Diann Browning had spoken to me first before posting these note(s) and Ryan had spoken to me first also This is not true, it's a lie. Ryan Elliotte also told me during the phone conversation that he had removed the posters himself and he left up only (1) in Mr. Grant's room, which was actually in the hallway. A copy was given to my legal assistant which should be in my file. I think

5

this poster was the best out of all that defendant Ryan Elliotte took down.

Ryan Elliotte said to me during that same phone call that he wants me to come in early for a meeting about 10pm before I started my shift which was 3rd (11pm-7am). After speaking to Defendant Ryan Elliotte I called a co-worker by the name of Muna Gbendah an African American who related to me some of the racist statement, slandering statements, and deferring statements that was on these notes.

According to the statement provided by Elliotte Manor LLC to the EEOC they claimed there were only (2) notes total that was posted at the facility, This statement is false, there were more than that.

(c)     I left home on April 30th 2017 to go to work early as requested by defendant Ryan Elliotte, and began questioning other staff members about the notes that was put up by Mr. Grant's daughter Diann Browning. I was told they were everywhere in the hallways, kitchen, dayroom, and they were in both building 1 and building 2. Mr. Grant resides in building 1 and his daughter went as far as to post note(s) in building 2 where her father does not reside. Question:  What reason that would be so offensive for Diann Browning to post note(s) all over building 1 and building 2? What could possibly trigger her mind to be so evasive, racist, and retaliate in such manner? What did I do to her or her family for her to go around posting note(s) slandering me, making racial remarks at me, and deferring my character, on the walls in a facility where I was hired by Ryan Elliotte, which is a family business? Most of the staff from 2nd shift (3pm-11pm) asked me, what did I do for Mr. Grant's daughter to say such things? One or two of the staff members asked, what could I have possibly have done to deserve this and I had just began working there? According to CNA's and residents they stated, there were many notes posted in both building 1 and building 2, about 12-15 total.

(d)     After I had spoken to staff and residents at about 10pm I headed to the office to speak to defendant Ryan Elliotte. I entered the office after I had knocked and Ryan Elliotte and myself began to talk about the current incident concerning what Diann Browning had done. During the conversation with Ryan Elliotte after Dianne Browning had posted the note(s) Ryan explained to me quite a few things about Mr. Grant and his daughter and Ryan's own mother Ms. Elliotte. Ryan Elliotte asked me, if I said what Mr. Grant's daughter Diann Browning said that I had say? I asked him what was that? Ryan Elliotte told me that Diann Browning said, I called her father a "nuisance." I told him NO, I did not say anything to Mr. Grant. All I do is give him his medication. Then Ryan then willing continued to tell me about Mr. Grant , and told me that Mr. Grant is a racist. Some older white folks think the world is still back in their day. He also told me he watched the camera and did not see me do anything. He also said that Mr. Grant asked him,

"why is he hiring all of these foreign niggas?" Ryan also stated, "this is not the first time that Dianne Browning has exposed herself by conducting herself to this type of behavior at the facility that was owned by Elliotte Manor." Ryan Elliotte also said, "he had spoken to his mother Ms. Elliotte and she told Ryan that Diann Browning had done this a few years earlier when Ryan Elliotte's mother was managing the other facility that was owned by her." The note(s) posted back then were racially inclined also. Ryan also stated, his mother Ms. Elliotte had spoken to Diann Browning concerning her behavior on the premises, and here she did it again. Ryan Elliotte also told me, "he would rather have a resident in the facility than have a CNA." Ryan Elliotte also asked me, "if I would talk to Mr. Grant's daughter for her to feel comfortable by me providing her father with his medication." He also told me, That I should tell Diann Browning that she cannot do what she did in the facility." Question: Who am I to tell any relative of a resident what and what they cannot do after that same person has slandered my name, deferred my character, and made me look like I am incapable of doing my job?

## C. EVIDENCE IN SUPPORT OF CHARGES AGAINST ELLIOTTE MANOR LLC

1.    Ryan Elliotte claimed that an incident at or about April 26th 2017 and it had been ongoing for (9) days, by myself refusing to give Mr. Grant his medication when he approached me for it.

SOLUTION: There was no incident on April 26th 2017 and there is no incident ongoing for (9) days. The real incident occurred when Diann Cosgrove plastered note(s) or posters all over the facility even in a building that her father does not reside.

2.    Ryan Elliotte claimed on April 27th 2017 that Mr. Grant pointed me out to his daughter and he told his daughter that I refused to provide him with his pain medication.

SOLUTION: April 27th 2017 I worked as a housekeeper in building 2 and I was not approached by Mr. Grant's daughter to speak to me about nothing, because I did not work on April 26th 2017. Mr. Grant could not have pointed me out because I never worked on that day, and I was working in building 2.

3.    Ryan Elliotte claimed he removed the other poster or note(s) that was put up by Mr. Grant's daughter Diann Browning and left (1) up and there was only (2).

SOLUTION: If Ryan Elliotte claimed there were only (2) note(s), and residents and CNA's that I spoke to including Ryan Elliotte all admitted there were many notes about 12-15 total in both buildings 1-2, this means Ryan Elliotte was trying to cover-up these other posters or note(s) by him not mentioning it to the EEOC. According to the law that is an act of destroying evidence

7

which is a criminal offense.

Ryan Elliotte did not disclose this information correctly to the EEOC and is trying to mislead an ongoing investigation. Ryan Elliotte himself admitted to me during the meeting on April 30th 2017 that he removed the other posters or note(s) personally but he never showed them to me. In doing so Ryan Elliotte concealed the evidence and try to have me meet the culprit Diann Browning who did these things and wrote these harsh and slanderous and racial words. In doing this he would be rendered, aiding and abetting and supporting of the actions of Mr. Grant's daughter criminal mischief by concealing and destroying the evidence without letting me see it.

4.      Ryan Elliotte removed 95% of the posters or note(s) that was posted by Mr. Grant's daughter Diann Browning and disposed of them.

SOLUTION: From the fact that there were more note(s) posted than what was mentioned by defendant Ryan Elliotte in his statement to the EEOC, the defendant has Obstructed Justice and in the proper manner an investigation should go on. The statement by the defendant lacks creditability and therefore is "Moot" in their defense by not giving a full, truthful, and accurate set of details of the events towards the charges. Elliotte Manor LLC has provided a false statement to EEOC in this investigation and has condoled to behavior that is unacceptable.

**D.      QUESTIONS IN REGARD TO UNCOVER THE TRUTH**

From the statement I have provided it has been distinguished the reality from the illusion presented by Elliotte Manor LLC. To further clarify such events on both sides, I have a few questions I would like to bring to the forefront. They are as follows:

1.(a)    Can Elliotte Manor LLC disclose the true number of note(s) that was personally removed from the walls of the facility?

(b)     If they can admit how many, then where are they?

2.      Can Elliotte Manor LLC give a reference of what was said on the other note(s)?

3.      Can Elliotte Manor LLC actually show video footage of myself on the job on the date of April 26th 2017?

4.    Can Elliotte Manor LLC clearly admit that they did not obstruct justice by concealing and disposing the other note(s) and didn't let the EEOC nor myself see their contents, and didn't even mention it in their statement?

5.    Can Elliotte Manor LLC admit that Mr. Grant's daughter Diann Browning does have a habitual behavior of slandering, deferring character, and making racial statements in an attempt to discredit Black people?

6.    Can Elliotte Manor LLC admit they did not condole to the behavior of Mr. Grant's daughter Diann Browning by concealing and destroying the other note(s)?

7.    Can Elliotte Manor LLC admit that they did not remove 95% of the note(s)?

8.    Can Elliotte Manor LLC admit as of now that they potentially do have video footage of Mr. Grant and myself in a dispute on the date of April 26th 2017?

9.    Can Elliotte Manor LLC admit they still have the 95% of the posters or note(s) in their possession?

10.    Can Elliotte Manor LLC admit that note(s) was not posted in both buildings 1-2 and their statement is truthful?

11.    Can Elliotte Manor LLC deny that during my time when I worked at the facility there were only (3) African Americans working there?

E.    **ACTS OF RETALIATION**

After the meeting on April 30th 2017 with Defendant Ryan Elliotte the following day May 1st 2017, I called Ryan to ask about the schedule for the month of May and he said he wasn't finished but I was off for the 1st of May. Ryan Elliotte usually send a text of the schedule to all workers so they can see their availability. During that phone call on May 1st 2017 Ryan Elliotte also told me, "do not be discouraged when I see the new schedule." Ryan Elliotte informed me that he was putting Stacy Cosgrove to work in the office to assist him in doing his paperwork and filing, and I would not be doing the (1) day housekeeping and the (1) day of floating from building 1 to building 2 no more. Ryan Elliotte also said he would take (2) days from Stacy Cosgrove to make up for the (1) day of housekeeping and (1) day of floating. During the month of April I used to work 5 days a week of 3 days Med Tech/CNA, 1 day housekeeping, and 1 day floating in order to get 40 hours per/week. I was supposed to be hired full-time as a Med Tech/CNA as to the ad posted on Indeed website for $11.00 pr/hr. But unfortunately I never

9

worked a complete full-time schedule for what I was hired for. The new schedule was supposed to be out on the last day of the previous month, but there was a delay. The schedule was not done and Ryan Elliotte already had made the changes mentioned in the phone call because he told me I was off May 1st 2017. Ryan Elliotte also mentioned to me in that phone call that the lady who works as the Activity Coordinator decided she wanted to do housekeeping, and that he would grant it to her and remove me from that position. The Activity Coordinator also happens to be Caucasian. Ryan Elliotte also told me he would like me to talk to Diann Browning to resolve this issue do I can defend myself, so Mr. Grant's Daughter Dianne Browning could feel comfortable with me providing her father with his medication and then he would restore my hours. Ryan Elliotte told me he would restore my hours by taking (2) days from Stacy Cosgrove to give to me after I spoke to Diann Browning.

On May 2nd 2017 I texted Ryan Elliotte to inquire about the schedule and the (EXHIBIT) provided by the defendant Ryan Elliotte was part of the text messages sent. Ryan Elliotte had already done the schedule that is why he told me to get it from Muna Gbendah. I requested the part-time hours after the schedule was done and Ryan Elliotte already had put me part-time without my knowledge. I went to the facility to obtain a copy of the schedule and when I saw the reduced hours I texted Ryan Elliotte and submitted my resignation and it was accepted. Ryan Elliotte told me I did not have to come in to continue working for the last (2) weeks. When I received my pay from the previous (2) weeks there was a reduction from $11.00 pr/hr to $7.25 pr/hr. Ryan Elliotte had agreed to my resignation yet he still violated his own bi-laws by reducing wages I had already worked. I had to file a complaint with the Department of Labor in order for me to get the remainder balance of my wages. See (EXHIBIT C) The date on the check.

I believe from phone call that Ryan Elliotte against me by taking away my (1) day housekeeping and (1) day floating to accommodate the Activity Coordinator and he had no replacement for another full-time Activity Coordinator. From this action by Ryan Elliotte he left the residents without a full-time activities for their daily rehabilitation, which is mandatory.

## CONCLUSION

From the above explicit statement provided according to the real events as they happened, I have proven that Elliotte Manor LLC has aided and abetted in an act of race oriented behavior. Ryan Elliotte, Mr. Grant, Diann Browning, Stacy Cosgrove, and the Activity Coordinator are all Caucasian and myself is an African American. Ryan Elliotte did not mention Stacy Cosgrove in his statement because She is not supposed to be around medication yet he had her train me on the only day I worked 2nd shift (2pm-11pm). Ryan Elliotte has given Stacy Cosgrove a raise in pay and had given her a promotion to work in the office after her incident from taking a

controlled substance from a resident from off the cart and she also took the MARs document for the recorded control substance in order to hide the prescribed medication of the resident. The question is why? At my time during my employment at Elliotte Manor LLC there was only (3) African Americans and about 87% of the workers were Caucasian.

As you can see from the evidence here I have presented Elliotte Manor has tried to cover-up the truth by disposing of evidence, concealing evidence, providing false statements, condoling to racist behavior, and retaliation in support of racist behavior. Elliotte Manor LLC has allowed Mr. Grant to remain on the premises and his daughter visiting rights after (2) explicit events of racist acts, slander, deformation of workers character, discrimination, and retaliation on their property towards workers of color.

Without further delay this matter has been properly identified as a race card by the above Defendant mentioned. Soon after I left working at Elliotte Manor LLC from my resignation dated May 2nd 2017 another African American Muna Gbendah left within (2) days with only (1) African American left.

I hold my peace.

Truthfully Yours,

Lisa Antoine (Charging Party)

11

EXHIBIT 7

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Lisa R. Antoine<br>2834 Parkway Avenue, Unit B<br>Charlotte, NC 28208 | From: | Charlotte District Office<br>129 W. Trade Street<br>Suite 400<br>Charlotte, NC 28202 |

| ☐ | On behalf of person(s) aggrieved whose identity is<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | | |

| EEOC Charge No. | EEOC Representative | | Telephone No. |
|---|---|---|---|
| **430-2017-02086** | **Hattie W. Murphy, Investigator** | | **(704) 954-6531** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*[signature]*

Reuben Daniels, Jr., Director

APR 26 2018

*(Date Mailed)*

Enclosures(s)

cc:
James Wrenn
Hopper Hicks & Wrenn
PO Box 247
111 Gilliam Street
Oxford, NC 27565

Jason A. Watson
SPIELBERGER LAW GROUP
202 S. Hoover Blvd
Tampa, FL 33609

EXHIBIT 8



U.S. Equal Employment
Opportunity Commission

Español | Other Languages

Enter search terms... | Search

CONNECT WITH US    

| Home | About EEOC | Employees & Applicants | Employers / Small Business |

| Federal Agencies | Contact Us |

---

**Laws, Regulations, Guidance & MOUs**

Overview

Laws

Regulations

Guidance

Memoranda of Understanding

Discrimination by Type

Prohibited Practices

Home > Laws, Regulations & Guidance > Prohibited Practices

  

# Prohibited Employment Policies/Practices

Under the laws enforced by EEOC, it is illegal to discriminate against someone (applicant or employee) because of that person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. It is also illegal to retaliate against a person because he or she complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

The law forbids discrimination in every aspect of employment.

The laws enforced by EEOC prohibit an employer or other covered entity from using neutral employment policies and practices that have a disproportionately negative effect on applicants or employees of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or on an individual with a disability or class of individuals with disabilities, if the polices or practices at issue are not job-related and necessary to the operation of the business. The laws enforced by EEOC also prohibit an employer from using neutral employment policies and practices that have a disproportionately negative impact on applicants or employees age 40 or older, if the policies or practices at issue are not based on a reasonable factor other than age.

**On This Page**

- Job Advertisements

- Recruitment

- Application & Hiring

- Background Checks

- Job Referrals

- Job Assignments & Promotions

- Pay And Benefits

- Discipline & Discharge

- Employment References

- Reasonable Accommodation & Disability

- Reasonable Accommodation & Religion

- Training & Apprenticeship Programs

- Harassment

## Job Advertisements

It is illegal for an employer to publish a job advertisement that shows a preference for or discourages someone from applying for a job because of his or her race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

For example, a help-wanted ad that seeks "females" or "recent college graduates" may discourage men and people over 40 from applying and may violate the law.

- Terms & Conditions Of Employment
- Pre-Employment Inquiries
- Dress Code
- Constructive Discharge/Forced To Resign

## Recruitment

It is also illegal for an employer to recruit new employees in a way that discriminates against them because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

For example, an employer's reliance on word-of-mouth recruitment by its mostly Hispanic work force may violate the law if the result is that almost all new hires are Hispanic.

## Application & Hiring

It is illegal for an employer to discriminate against a job applicant because of his or her race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not refuse to give employment applications to people of a certain race.

An employer may not base hiring decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires job applicants to take a test, the test must be necessary and related to the job and the employer may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, or individuals with disabilities. In addition, the employer may not use a test that excludes applicants age 40 or older if the test is not based on a reasonable factor other than age.

If a job applicant with a disability needs an accommodation (such as a sign language interpreter) to apply for a job, the employer is required to provide the accommodation, so long as the accommodation does not cause the employer significant difficulty or expense.

## Background Checks

See "Pre-Employment Inquiries" below.

## Job Referrals

It is illegal for an employer, employment agency or union to take into account a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information when making decisions about job referrals.

## Job Assignments & Promotions

It is illegal for an employer to make decisions about job assignments and promotions based on an employee's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not give preference to employees of a certain race when making shift assignments and may not segregate employees of a particular national origin from other employees or from customers.

An employer may not base assignment and promotion decisions on stereotypes and assumptions about a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

If an employer requires employees to take a test before making decisions about assignments or promotions, the test may not exclude people of a particular race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), or national origin, or individuals with disabilities, unless the employer can show that the test is necessary and related to the job. In addition, the employer may not use a test that excludes employees age 40 or older if the test is not based on a reasonable factor other than age.

## Pay And Benefits

It is illegal for an employer to discriminate against an employee in the payment of wages or employee benefits on the bases of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. Employee benefits include sick and vacation leave, insurance, access to overtime as well as overtime pay, and retirement programs. For example, an employer many not pay Hispanic workers less than African-American workers because of their national origin, and men and women in the same workplace must be given equal pay for equal work.

In some situations, an employer may be allowed to reduce some employee benefits for older workers, but only if the cost of providing the reduced benefits is the same as the cost of providing benefits to younger workers.

## Discipline & Discharge

An employer may not take into account a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information when making decisions about discipline or discharge. For example, if two employees commit a similar offense, an employer many not discipline them differently because of their race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

When deciding which employees will be laid off, an employer may not choose the oldest workers because of their age.

Employers also may not discriminate when deciding which workers to recall after a layoff.

## Employment References

It is illegal for an employer to give a negative or false employment reference (or refuse to give a reference) because of a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

## Reasonable Accommodation & Disability

The law requires that an employer provide reasonable accommodation to an employee or job applicant with a disability, unless doing so would cause significant difficulty or expense for the employer.

A reasonable accommodation is any change in the workplace (or in the ways things are usually done) to help a person with a disability apply for a job, perform the duties of a job, or enjoy the benefits and privileges of employment.

Reasonable accommodation might include, for example, providing a ramp for a wheelchair user or providing a reader or interpreter for a blind or deaf employee or applicant.

## Reasonable Accommodation & Religion

The law requires an employer to reasonably accommodate an employee's religious beliefs or practices, unless doing so would cause difficulty or expense for the employer. This means an employer may have to make reasonable adjustments at work that will allow the employee to practice his or her religion, such as allowing an employee to voluntarily swap shifts with a co- worker so that he or she can attend religious services.

## Training & Apprenticeship Programs

It is illegal for a training or apprenticeship program to discriminate on the bases of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. For example, an employer may not deny training opportunities to African-American employees because of their race.

In some situations, an employer may be allowed to set age limits for participation in an apprenticeship program.

## Harassment

It is illegal to harass an employee because of race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information.

It is also illegal to harass someone because they have complained about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.

Harassment can take the form of slurs, graffiti, offensive or derogatory comments, or other verbal or physical conduct. Sexual harassment (including unwelcome sexual advances, requests for sexual favors, and other conduct of a sexual nature) is also unlawful. Although the law does not prohibit simple teasing, offhand comments, or isolated incidents that are not very serious, harassment is illegal if it is so frequent or severe that it creates a hostile or offensive work environment or if it results in an adverse employment decision (such as the victim being fired or demoted).

The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a client or customer.

Harassment outside of the workplace may also be illegal if there is a link with the workplace. For example, if a supervisor harasses an employee while driving the employee to a meeting.

*Read more about harassment.*

## Terms & Conditions Of Employment

The law makes it illegal for an employer to make any employment decision because of a person's race, color, religion, sex (including gender identity, sexual orientation, and pregnancy), national origin, age (40 or older), disability or genetic information. That means an employer may not discriminate when it comes to such things as hiring, firing, promotions, and pay. It also means an employer may not discriminate, for example, when granting breaks, approving leave, assigning work stations, or setting any other term or condition of employment - however small.

## Pre-Employment Inquiries (General)

As a general rule, the information obtained and requested through the pre-employment process should be limited to those essential for determining if a person is qualified for the job; whereas, information regarding race, sex, national origin, age, and religion are irrelevant in such determinations.

Employers are explicitly prohibited from making pre-offer inquiries about disability.

Although state and federal equal opportunity laws do not clearly forbid employers from making pre-employment inquiries that relate to, or disproportionately screen out members based on race, color, sex, national origin, religion, or age, such inquiries may be used as evidence of an employer's intent to discriminate unless the questions asked can be justified by some business purpose.

Therefore, inquiries about organizations, clubs, societies, and lodges of which an applicant may be a member or any other questions, which may indicate the applicant's race, sex, national origin, disability status, age, religion, color or ancestry if answered, should generally be avoided.

Similarly, employers should not ask for a photograph of an applicant. If needed for identification purposes, a photograph may be obtained after an offer of employment is made and accepted.

## Pre-Employment Inquiries and:

- Race

- Height & Weight

- Financial Information

- Unemployed Status

- Background Checks

- Religious Affiliation Or Beliefs

- Citizenship

- Marital Status, Number Of Children

- Gender

- Disability

- Medical Questions & Examinations

## Dress Code

In general, an employer may establish a dress code which applies to all employees or employees within certain job categories. However, there are a few possible exceptions.

While an employer may require all workers to follow a uniform dress code even if the dress code conflicts with some workers' ethnic beliefs or practices, a dress code must not treat some employees less favorably because of their national origin. For example, a dress code that prohibits certain kinds of ethnic dress, such as traditional African or East Indian attire, but otherwise permits casual dress would treat some employees less favorably because of their national origin.

Moreover, if the dress code conflicts with an employee's religious practices and the employee requests an accommodation, the employer must modify the dress code or permit an exception to the dress code unless doing so would result in undue hardship.

Similarly, if an employee requests an accommodation to the dress code because of his disability, the employer must modify the dress code or permit an exception to the dress code, unless doing so would result in undue hardship.

## Constructive Discharge/Forced To Resign

Discriminatory practices under the laws EEOC enforces also include constructive discharge or forcing an employee to resign by making the work environment so intolerable a reasonable person would not be able to stay.

**CONNECT WITH US**   

Privacy Policy | Disclaimer | USA.Gov